[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
This case comes to this court on an application for relief from abuse temporary restraining order. This court, Ballen, J., on May 6, 1992, granted a temporary restraining order which was set down for hearing on May 20, 1992. The court heard that restraining order presented by the wife. In addition, an application for writ of habeas corpus and temporary restraining order was filed, and the order of habeas corpus and restraining order and affidavit and other necessary papers was sent to this court for a simultaneous hearing by Ballen, P.J.
The parties agreed to blend together the hearing and CT Page 4840 to proceed to hear both of the matters at the same time. Although Suzanne Onthank, the respondent in the habeas corpus (hereinafter called the mother), never filed a return, see Connecticut Practice Book 533, this court treats her denial of the relief requested and the temporary restraining order as an oral return. The parties must remember that a petition for habeas corpus requires a return which is basically an answer. This court orders such return be filed in order to perfect the file, but has treated the return as a denial of the allegations in the habeas corpus. This issue was not raised by either of the parties at trial and is, therefore, deemed waived.
The issues before the court simply stated are should the temporary restraining order continue and should the writ of habeas corpus be granted. The court will address the temporary restraining order first. The parties shall hereinafter be called the mother and father as it relates to the habeas corpus and are hereinafter called husband and wife as it relates to the temporary restraining order.
The wife testified concerning the statements set forth in her affidavit of May 6, 1992, attached to her application for relief from abuse. It is undisputed that on the evening of April 24th (perhaps into the early morning of April 25th) the husband struck the wife. The dispute is the magnitude of the force. The wife described the striking as a punch which caused a black and blue mark. The husband described the striking on the thigh as a slap.
It is clear that the wife is physically afraid of the husband. She indicates that he has abused alcohol, pot and cocaine in the last year of their marriage and abused alcohol and pot within the last month. She also described what she believed to be more than reasonable force in a spanking given to one of the sons. The wife testified the husband told her that she was on this planet to take care of the husband and the monkeys.
The wife's further testimony was that she did not have consentual sex with her husband while they were on vacation. She testified that her purpose of moving to Colorado was to get as far away from the husband as possible with the children. The husband admitted that the wife had told him on previous occasions that she was afraid of him. The husband, on cross-examination, indicated that he needed help concerning his drinking, his temper and the fact that he is a "natural control person." The husband also admitted that in April of 1991 he did physically push her back during an argument and then hit a wall with his hand. CT Page 4841
It is clear under all the circumstances that a temporary restraining order should continue in place in this case.
As it relates to the habeas corpus and temporary restraining order therein, it is clear that the wife relocated to Colorado. She testified that she has a job for a company called Sailways, which job pays her a salary of "around $50,000.00" and a commission rate of 33 per cent of the space she sold and the company was paid for. (See exhibit 3.) She testified that there are presently 12 monkeys in the house in Connecticut. She has seen counselors and has talked with the battered women shelter. The counselors and the battered women shelter were in Connecticut. She began anti depressants two weeks ago which were ordered by a Connecticut physician.
The wife testified that the last time she used "Coke" was in 1987, and she has not used marijuana in the last year, and she has consumed alcohol in the last two weeks. Before that, it may be alcohol three or four times per week. She had no financial wherewithal and, in fact, sold her engagement ring just before the hearing for $6,000.00 in order to pay $5,000.00 for attorney's fees. She had previously paid her attorney $2,500.00. The wife testified that even after fights the husband would make her sleep in the same bed.
The wife is staying in borrowed accommodations in Colorado. She has no housing in Telluride, Colorado, but contemplates making such arrangements. She removed a substantial amount of items from the marital home and they were placed in storage. Those items are shown on exhibit four. She testified that she has nothing in writing that she has to be in Telluride by Friday or permanently reside in Telluride. She testified in no uncertain terms that the purpose of moving to Colorado was to get away from her husband. She indicated the job was secondary and was only necessary to pay for food and essentials.
Complicating the parties' lives this past year has been the illness of the husband's father and his eventual death and funeral on May 13, 1992. The husband was upset about it, and the wife was even more upset because she had seen serious problems with her parents when they lost their parents.
The children were left in Colorado with Arabella Gill, who was the caretaker of the children hired by the parties in November, 1991 in Connecticut. She is from Brazil. While the wife was in Connecticut at the hearing, Ms Gill was taking care of the children. This court has been advised by counsel that a dissolution of marriage action is now pending in this court CT Page 4842 between the parties.
The wife testified that the cost of plane tickets to Colorado were "on a real deal $350.00 and $1,000.00 no deal" and this was a per person charge.
The wife alleged that the husband drank in the morning, and testified that on one occasion he had started drinking at 11:00 a.m.
The husband testified that he is employed as a senior vice president at Paine Webber in Darien. He has not consumed alcohol within the past three weeks and no marijuana within the past three weeks. He described the incident in April as a slap on her leg rather than a punch. He testified that in 1991 he made somewhere between $200,000.00 and $300,000.00. Approximately $18,000.00 was salary, commissions were $150,000.00 and forgiveness of a loan of $70,000.00 were some of the ingredients of his income.
The husband admitted that he was told by his wife on more than one occasion that she was afraid of him. He testified that the wife had a very substantial fear of death. He testified she was super sensitive. He said, "I push her against the wall and she says it is a beating." He said he never forced sex on her. He testified that alcohol was a problem with the wife. He testified the wife smoked marijuana six weeks ago with his brother and sister-in-law. He did admit that he smoked marijuana with his brother a month ago. He felt that his wife was there for everyone except him during the time of crisis when his father was dying. He said she blew out of proportion the April 25th incident when, after he slapped her on the leg, she said, "Oh, my God, if you do this now, what will you do when your father dies?"
The husband testified that he is good with the children and does not spank them except on their bottom and for a maximum of five times over their lives. He uses a technique that he calls "time out" where he puts the child in a corner while things quiet down. He testified the boys mean everything to him, particularly Pierce who is the older of the two boys. He sees the children on a regular basis. He is concerned that the wife has bulimia in that she throws up after her meals. When asked how many times he had seen her throw up, he said over a hundred times.
The wife asked him, according to his testimony, to promise that he would not yell at her. He refused since he said getting angry is a natural way to argue. He blames a lot of the problems of the wife on her problems with pregnancy in which CT Page 4843 Ryan was born six weeks early.
The husband addressed the issue of the monkeys in the house. He has a license to breed and sell monkeys. There is a special room, 18 feet tall, and there is no smell with a special self-cleaning floor and it is a high tech operation. Arabella was at one time the monkeys' keeper. The husband testified that the monkeys are not mean although there was a mean male who was removed from the collection. The husband says he owns four of the monkeys, maybe $8,000.00 to $10,000.00 total value.
The husband said he has used marijuana in the last year maybe six times and says the wife has done the same over the last year. The husband says the wife drinks two to three vodka tonics, tall ones as he described it. The husband has not had a drink in the last three weeks based on his testimony. He denied early morning drinking.
The husband also testified that a typical week found him with the children on Saturdays while the wife had an opportunity to do what he described as her "own thing." He has not had phone contact since May 2nd when he last saw the children. The husband indicated he is prepared to go to counseling, to support the wife, move out and do all that is necessary to be with his sons. He generally is home at the latest 6:00 or 6:30 p.m. during the week and has an opportunity to see the kids. He says it is only 15 minutes or so from his office to his home. The wife has had a child care person, a housekeeper and babysitters on demand during the course of the marriage. He testified that the wife never said that she was concerned about leaving the children with him. He testified that at the father's funeral the wife did not appear to be in fear of him. The husband testified that on many occasions the wife would call him at work so that he could discipline Pierce over the phone.
Ms. Lewis-Varley testified. She testified she was involved in removing the furniture from the marital home and assisted the wife. She said the husband had called her 15 to 20 times since the 8th of May when she became involved.
Ms Ferra of French Street in Bridgeport has a business and personal relationship with the Onthanks. She has three children. Her age is 34. She had worked at the house as a housekeeper for four years. She had been there two or three times per week in the past but less lately. On one occasion she testified she observed the wife under the influence of alcohol and was worried about her daughter driving with her. She described the Onthank's social life as very busy. CT Page 4844
The witness said that the wife had no control over the children. She said she has seen the father with the children and has seen the father feed a bottle to Ryan. She felt that, based on her observations, the mother was not a good mother and did not take good care of the children. She felt, on the other hand, that the mother was a good friend and a nice person. She felt the husband was a good father.
Ms Wittenberg, a travel agent, testified. She indicated the time it takes to fly to Colorado and the rates. Flying from New York to Telluride, Colorado, 14 days in advance, round trip fare was $500.00; seven days in advance was $560.00. With no advance, it ranged between $557.00 to $565.00 one way. The route would be New York to Denver and Denver to Telluride, all on Continental Airlines. Four hours and 20 minutes in the air, New York to Denver; Denver to Telluride, one hour and 15 minutes and one hour additional for the allotted connecting flights. Flights from Denver to Telluride and from Telluride to Denver are limited to a couple per day. Her feeling was that from Fairfield to Telluride was a total trip in excess of nine hours. On a direct flight, the child must be age five to fly alone and age eight on connecting flights. Neither one of these children are of that age.
Pierce's mother, the paternal grandmother, Mrs. Onthank, testified. She sees the grandchildren weekly. She has vacationed with them in Martha's Vineyard and Cape Cod over the years. She had no idea that her daughter-in-law was leaving the state of Connecticut. She testified that her daughter-in-law said she was so depressed she even considered committing suicide around Christmas. The witness testified that she had referred her daughter-in-law to a psychologist and at some point the daughter-in-law said it did not help. The daughter-in-law had discussed with the witness her fear of what would happen to her husband on his father's death as she had seen the nervous breakdowns that her parents had had on the death of their parents. The mother-in-law testified that the wife had said she left because Pierce beat her and she was afraid.
The witness testified she has a strong relationship with the children and so does her son. She never saw any physical abuse on young Pierce. She had no concerns about Pierce's fathering. She also had no concern about Pierce's ability to care for Ryan. She described both of the parties as drinking on social occasions. She never saw either one of them intoxicated. She has observed the parties together and felt that Pierce provided the discipline in the family.
Daniel Boyce, the president and one of the owners of Sailways, testified. He is the one who does the hiring and the CT Page 4845 firing. He testified that he met the wife in early April of 1992 concerning discussions of hiring her. He was uncertain whether she was one of his employees or not. He thinks she was hired some weeks ago. She is working presently on commission, not on salary at this moment since she is not on the payroll. He did not know whether she was working for him the 22nd of May and thereafter in Colorado. It was his supposition that she was an employee.
Mr. Boyce testified that the wife had indicated she could go out to Colorado and do this event for him. He did not require her to go to Colorado. He further testified that her residence in Colorado would be helpful to the job, but it was not a condition. She is supposed to close a deal in Colorado. He does not know if it is going to take three days, three weeks, three months or three years.
It is abundantly clear to this court that, based on the testimony received at the habeas corpus proceeding and the temporary restraining order proceeding, that there are many unresolved issues of credibility between the parties and issues as they relate to permanent care, custody and protection of the children and the respective parties.
This court has taken into consideration all of the testimony set forth above and has reviewed all of the exhibits in the case and has listened to the arguments of counsel. The court has further taken into consideration Connecticut General Statutes 46b-15, et seq., concerning relief from physical abuse by family or household members. In addition, the court has taken into consideration Connecticut General Statutes 46b-56
and 46b-90, et seq., and 529 through 536 of the Connecticut Practice Book and has taken into consideration the question of the best interests of the children. The court has reviewed both parties requests for relief. This is the home state for this case.
In Connecticut trial courts are allowed to order support orders in habeas corpus proceedings. This was done in the instant case. See Howarth v. Northcott, 152 Conn. 460, 464
(1965). In addition, Connecticut General Statutes 46b-15, et seq., does allow the court to make appropriate orders for the protection of dependent children.
A habeas corpus petition is an equitable proceeding in which the trial court is called upon to decide, in the exercise of its sound discretion, the custodial placement which will be best for the children. See Evans v. Santoro, 6 Conn. App., 707
(1986). CT Page 4846
In balancing the equities in deciding this case, the court has sought to do what is in the best interests of the children. It is abundantly clear that, until the children were removed to Colorado, they had no contacts to that state. All of their support systems, friends, medical people, family and the like live in Connecticut. The wife's relatives live in Connecticut. The wife's parents live in Connecticut. The marital domicile had been in Connecticut, and all of the significant contacts were in Connecticut. In fact, Colorado provides an uncertain situation for the children. They are with people that they have not ever laid eyes on before the 6th day of May, 1992, and when they arrived in Colorado. They are being kept by nonfamily members. There is no permanent home for them in Telluride, and in balancing all of this, it is in the best interests of the children to be back in Connecticut while the litigation concerning their care, custody and the dissolution of the marriage takes place.
The court finds that the following orders best serve the interests of justice at this time.
1. Susanne Onthank is hereby temporarily restrained from removing the minor children, Robert Pierce Onthank, Jr. and Ryan Turner Onthank, from the State of Connecticut and ordered to immediately return the children to the State of Connecticut. All costs of relocating the wife and children to Connecticut shall be prepaid by the husband. Said amount to be paid by the husband is not to exceed $4,000.00.
2. As long as Susanne Onthank occupies same as her principal residence and that of the minor children, that she have exclusive use of the family residence located at 1257 Jennings Road, Fairfield, Connecticut, subject to the following limitations:
 a. If Susanne Onthank requests in writing the removal of the monkeys from the dwelling, Robert Pierce Onthank, Sr. shall cause to have them removed within 45 days thereof. Until such time of removal of the monkeys from the residence, Mr. Onthank shall be permitted three hours use of the residence between the hours of 9:00 a.m. and 5:00 p.m. on either Saturday or Sunday weekly to care for the monkeys as well as reasonable access to remove the monkeys upon implementation of the order as long as he is accompanied by another adult over the age of 22.
 If the monkeys need routine attention during the week, someone other than the husband shall provide same. CT Page 4847 The wife shall not be responsible for the care of the monkeys.
 b. Mr. Onthank shall not enter into the residence other than as set forth above. He may enter on the property to pick up and drop off the minor children, which entry shall be accompanied by another adult over the age of 22.
 c. Mr. Onthank shall not impose any restraint upon Susanne nor molest, assault, sexually assault, or attack her.
 d. Mr. Onthank shall be permitted to contact Susanne by telephone solely for the purpose of discussing the children one time weekly or in case of emergency. He shall be permitted reasonable telephone access to the children each day not to exceed one call daily to the children.
3. The wife shall have legal custody and the children shall primarily reside with the mother so long as it is in the State of Connecticut. The father shall have the following visitation:
 a. Two alternating weekends per month from Friday at 5:00 p.m. until Sunday at 5:00 p.m. with both minor children.
 b. One weekday evening from 5:00 p.m. to 8:00 p.m. with the minor son, Pierce, Jr.
 c. The minor children shall be with the father for any period the mother will not be with the children for a four day consecutive period.
 d. The father shall not use or abuse alcohol or drugs while the children are in his care.
4. This matter is referred to the Family Relations Office for mediation, investigation and study as it determines appropriate for all presently unresolved issues including the need for an attorney for the children and such psychiatric evaluation of the parties as it determines necessary.
5. Until further order of the court, which shall enter upon request of either party wherein the parties have an opportunity to present complete financial affidavits to the court, the husband shall pay, without prejudice, the CT Page 4848 household expenses of 1257 Jennings Road, Fairfield, Connecticut, including mortgage, taxes, insurance, utilities, medical insurance, automobile insurance, and uninsured medical expenses for the minor children. In addition, the husband shall pay food and clothing expenses for the children to the wife.
 If the wife retains her employment here in Connecticut at the rate as testified, then she shall pay her expenses of food and clothing and other miscellaneous expenses. If the wife does not retain said employment, further orders shall enter on application of either party.
6. On receipt by the wife of this decision, she is to contact the husband and make arrangements for a telephone call between the husband the children within 24 hours.
7. Until the children return to Connecticut, the husband shall have daily phone contact with the children as agreed on between the parties. If they cannot agree, then the husband may speak to the children between 5:00 p.m. and 7:00 p.m. Denver time at his convenience.
EDWARD R. KARAZIN, JR., JUDGE